**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2018 FEB 22  AM 10: 41

Civil Case No. _____

DEPUTY CLERK_____

Joel Ciarochi, M.D., M.B.A., and
Thomas Kenjarski, M.D. on behalf
of the United States of America,
Plaintiff/Relator

318 - CV0441 - M

**FILED UNDER SEAL**
**JURY TRIAL DEMANDED**

**vs.**

Texas Digestive Disease Consultants, P.L.L.C.
TDDC Parent, P.A.
Star Anesthesia, P.A.
Physicians John/Jane Doe 1 through 50
Certified Registered Nurse Anesthetists John/Jane Doe 1 through 50

Defendants

---

### *QUI TAM* COMPLAINT

---

RELATORS JOEL CIAROCHI, M.D., M.B.A and THOMAS KENJARSKI, M.D. bring this *qui tam* action in the name of the United States of America, by and through their undersigned attorneys Christopher A. Payne, Timothy Robinson, Aaron Robinson, and Christina Alstrin, and alleges as follows:

### SUMMARY INTRODUCTION

1.      This is an action by *qui tam* Relators Joel Ciarochi, M.D., M.B.A., and Thomas Kenjarski, M.D., on behalf of the United States, against Defendants Texas Digestive Disease

Consultants, P.L.L.C., and TDDC Parent, P.A., (henceforth collectively referred to as "TDDC") and Star Anesthesia, P.A. ("Star") to recover penalties and damages arising from (1) TDDC knowingly presenting to the United States Government, to state Medicaid payors, and/or commercial payors, false or fraudulent claims for payment for services from an entity that was neither a legitimate nor a commercially reasonable anesthesia company; and (2) TDDC and Star knowingly and willfully offering a kickback, in the form of revenue from anesthesia services, in return for referrals of individuals (i.e. "patients") to TDDC (and/or facilities in which TDDC and/or its members had an ownership interest) from Gastroenterologists for which payment was made in whole or in part under a Federal health care program.

2.    In doing so, TDDC enlisted the services of multiple anesthesia providers, including Anesthesiologists and/or Certified Registered Nurse Anesthetists (CRNAs), including from Star, to be complicit in a type of scheme which the Department of Health and Human Services Office of the Inspector General commonly refers to as the "company model." Under the company model, referring physicians (e.g. Gastroenterologists), who typically also own the facility where surgical procedures (e.g. endoscopies) are performed, form a separate anesthesia company (or division of a company) in order to share in anesthesia revenue. The referring physicians pay the anesthesiologists a portion of the anesthesia revenues (the anesthesia professional fee) and retain the balance as profit. One such group of anesthesia providers who contracted with TDDC in this capacity was Star Anesthesia, P.A. in San Antonio, Texas. This scheme constitutes multiple violations of the federal Anti-Kickback Statute (*42 U.S.C. 1320a-7b(b)*) and the False Claims Act, (*31 U.S.C. §§ 3729 et seq.*).

3.    Dr. Joel Ciarochi and Dr. Tom Kenjarski are board-certified Anesthesiologists licensed in the State of Texas and are the managing members of Noble Anesthesia Partners, PLLC, a legitimate, commercially reasonable anesthesia Medical Group which has grown from two active anesthesia providers in 2011, to more than sixty providers today. Both have been actively involved in the provision of anesthesia services in the Dallas/Fort Worth market place for more than seventeen (17) years. As such they have intimate knowledge and understanding of the various attempts by physicians to monetize anesthesia services intended to provide remuneration to Gastroenterologists and other physicians for the use of specific anesthesia providers. Dr. Ciarochi and Dr. Kenjarski have articulated the improper arrangements and the illegal kickbacks being provided to Gastroenterologists and other physicians, and despite having informed certain

Gastroenterologists and/or their representatives of the improper and illegal arrangements, and informing them that these arrangements violate the Federal Anti-Kickback Statute and the False Claims Act, has lost business to the Defendants who actively engage in such illegal practices in order to garner additional business. Having accomplished nothing by informing the Gastroenterologists and other Defendants, he now seeks legal redress.

## PARTIES

1.      Relator Joel Ciarochi, M.D., M.B.A. is a citizen of the State of Texas.

2.      Relator Tom Kenjarski, M.D. is a citizen of the State of Texas

3.      Defendant Texas Digestive Disease Consultants, P.L.L.C. is a Texas Professional Limited Liability Company which is a conversion of Texas Digestive Disease Consultants, P.A. which was formed on or about December 28, 1984. The conversion to a PLLC became effective on or about January 1, 2017. Its principal office is 8267 Elmbrook Drive, Suite 200, Dallas, TX 75247. It can be served with citation through its registered agent, TDDC Parent, P.A., 8267 Elmbrook Drive, Suite 200, Dallas, TX 75247.

4.      Defendant TDDC Parent, P.A. is a Texas Professional Association with its principal office located at 8267 Elmbrook Drive, Suite 200, Dallas, TX 75247. It can be served with citation through its registered agent, Peggy Seiler, at 8267 Elmbrook Drive, Suite 200, Dallas, TX 75247.

5.      Defendant Star Anesthesia Texas, P.A., is a Texas Professional Association with offices located at 3510 N Loop 1604 E. San Antonio, TX 78247. It can be served with citation through its registered agent Steve Robert, 45 NE Loop 410 Suite 900, San Antonio, TX 78216.

6.      Defendant Physicians John/Jane Doe are anesthesiologists whose identity Relator has not yet been able to determine, but who entered into contractual agreements as described hereinafter in violation of the False Claims Act and Anti-Kickback Statute.

7.      Defendant CRNAs John/Jane Doe are certified registered nurse anesthetists whose identity Relator has not yet been able to determine, but who entered into contractual agreements as described hereinafter in violation of the False Claims Act and Anti-Kickback Statute.

## JURISDICTION & VENUE

8.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.,* and the Anti-Kickback Statute *42 U.S.C. 1320a-7b(b).*

9.      This Court maintains subject matter jurisdiction over this action pursuant 31 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

10,      Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because: (i) One or more of the Defendants is located within this district and was at all times relevant to this complaint; and, as averred below, (ii) One or more of the Defendants committed acts proscribed by 28 U.S.C. § 3729 and/or 42 U.S.C. 1320a-&b(b) — acts giving rise to this action—within this district.

11.      Before filing this complaint, Dr. Ciarochi and Dr. Kenjarski served a copy of same upon the United States, together with a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

12.      Dr. Ciarochi and Dr. Kenjarski have complied with all other conditions precedent to bringing this action.

13.      Dr. Ciarochi and Dr. Kenjarski are the original source of, and have direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the Government before filing this action.

## FACTUAL ALLEGATIONS

14.      TDDC was formed by Gastroenterologists in North Texas who came together in a single organized entity in 1995.

15.      On their website, www.tddctx.com, TDDC describes itself as, "…a professional association of exceptionally well trained Gastroenterologists...with the support of an excellent staff." TDDC does not describe itself as being in the business of anesthesia or practice of Anesthesiology whatsoever.

16.      However, the TDDC website listed "Eric Dow" as "Endoscopic and Anesthesia Services Director."

17.     TDDC does not employ Anesthesiologists or CRNAs.

18.     TDDC entered into multiple independent contractor agreements with Anesthesiologists, CRNAs and anesthesia Medical Groups throughout the state of Texas, including Star Anesthesia, P.A., to provide anesthesia services for TDDC.

19.     TDDC out-sourced the most vital anesthesia practice management services to third party vendors, including but not limited to billing, collections, and compliance.

20.     Therefore, TDDC was not a legitimate or commercially reasonable anesthesia practice, but rather was (or had an affiliated) a sham "company model" anesthesia entity.

21.     TDDC utilized anesthesia revenue as a kickback to Gastroenterologists in return for referrals of individuals to TDDC (and/or facilities in which TDDC and/or its members had an ownership interest) for Gastroenterology services (including professional fees and surgical procedures) for which payments were made in whole or in part under Federal health care programs.

## HEALTH CARE BENEFIT PROGRAMS

22.     Aetna, Blue Cross Blue Shield of Texas ("BCBS"), Cigna, United Healthcare ("UHC") et al are health care insurance companies that provide health care benefits to individuals enrolled for coverage under individual and group policies.   At all times during the relevant period, each of them were a "health care benefit program" as defined by 18 U.S.C. 24 (b).

23.     Aetna, BCBS, Cigna and Blue Cross Blue Shield of Texas ("BCBS"), UHC and other non-governmentally operated health care benefit programs are commonly referred to as "commercial payors" and/or "commercial health care programs."

24.     Medicare is a single-payor, national social insurance program administered by the United States federal government, currently using private insurance companies across the United Stated under contracts for administration.

25.     Medicaid is a state-based program funded, at least in part, by federal funds. Medicare together with Medicaid, and other governmentally operated health care programs, such as Tri-Care, are commonly referred to as "governmental payors" and/or "federally funded health care benefit programs."

## PROPER BILLING AND CONTRACTING

26.     The State of Texas continues to maintain a broad prohibition against the corporate practice of medicine.

27.     Physicians in the State of Texas are commonly classified as "Independent Contractors" in Employment Agreements and other Professional Services Agreements since only Physicians, as opposed to corporate entities, are licensed to provide medical services.

28.     However, in the eyes of the IRS, all health care providers, including Anesthesiologists and CRNAs, are subject to the same tests for Employee vs. Contractor designation, which are organized into three groups: behavioral control, financial control, and the type of relationship between the parties (IRS Form SS-8).

29.     That being said, most health care providers, such as Anesthesiologists and CRNAs, sign Employment Agreements with Medical Groups, such as Star Anesthesia, P.A., to provide anesthesia services on behalf of the Medical Group.  Under the terms of most, if not all of these Employment Agreements, each anesthesia provider, whether Anesthesiologist or CRNA, must assign the right to bill and collect for anesthesia services submitted under their National Provider Identifier (NPI) number to the Medical Group exclusively.

30.     Reciprocally, the Medical Group is entitled to the exclusive right to all fees generated by each Anesthesiologist or CRNA from or incident to the anesthesia services rendered by the Anesthesiologist and/or a medically directed CRNA.  In return for their anesthesia services, each Anesthesiologist or CRNA receives a compensation package from a Medical Group, which is typically comprised of a salary and other benefits.

31.     Some health care providers, such as Anesthesiologists and CRNAs, enter into Independent Contractor Agreements with Medical Groups, such as TDDC, to provide anesthesia services on behalf of the Medical Group.  These Independent Contractor Agreements may be the only source of income for the Anesthesiologist or CRNA or may be a supplemental source of income for the Anesthesiologist or CRNA.  Regardless of an Anesthesiologist or CRNA's employment status elsewhere, each Anesthesiologist or CRNA and each Medical Group who enter into an Independent Contractor Agreement are subject to the IRS tests for Employee vs. Contractor designation.

32.     As for the payors' side, individual health care providers, or the Medical Groups that

employ or contract with them, submit claims (i.e. "billing") to commercial or government program payors and are then paid (i.e. "collections") on a "fee-for-service" basis, which is a method in which the health care provider or their Medical Group are paid for each service performed. Should the claims be submitted by a Medical Group instead of the individual health care provider, the Medical Group may in turn choose to pay the health care provider a fixed regular payment (e.g. a salary) or pay them on a contract basis.

33.     As for the patients' side, individuals who purchase healthcare insurance programs typically do so by enrolling in health care benefit programs, such as Aetna, BCBS, Cigna, UHC, Medicare, Medicaid and Tri-Care through an array of plans that vary broadly in costs, coverage, and benefits.   Once enrolled, an individual needing health care services typically pays some deductible or co-pay amount for health care services provided, and the commercial and/or federal health care programs with whom the individual is enrolled, provides payments for "covered services" to Medical Groups (e.g. Star, TDDC, and other health care providers) that participated in the health care benefit program's network (i.e. "in-network" benefits). These insurance contracts provide patients with assurances that there will be a limit on the amount of money they must spend on healthcare as provided in their individual and/or group contracts.

34.     Similarly, Medical Groups, such as Star, TDDC, and other health care providers enter contractual agreements with commercial health care programs and federal health care programs, in order to participate in each health care benefit program's network and gain access to more patients.  These contractual agreements bind all Medical Group providers to participate in the health care benefit program's network, and that all services be provided as in-network services whenever possible. These contractual agreements further require that all providers, including Anesthesiologists and CRNA's, provide their services in compliance with the terms and conditions of the network agreements with their Medical Group (i.e. their Employer), including that all services be provided as in-network services whenever possible.

35.     Recognizing that not all healthcare providers will, or even can, contract with all commercial payors, and that not all commercial payors want to contract with all healthcare providers for various reasons, most commercial health care benefit programs also provide certain limited benefits pursuant to which they will provide payments for services provided by healthcare providers that do not have a direct contractual agreement with the commercial payor to participate in the payor's network (i.e. "out-of-network" benefits).  Typically, the commercial payors out-of-

network commercial benefits impose a higher co-pay and/or deductible amount on the patient than when a patient utilizes an in-network healthcare provider. However, many times, the healthcare provider also receives a higher payment from the commercial health care benefit program than it would receive for such services if the healthcare provider had an in-network contract covering the same services. For instance, for providers that do not contract with UHC, and are outside of their network, UHC typically pays a percentage of billed charges, sometimes 70-90% of billed charges, after the patient meets their annual out-of-network deductible. BCBS typically pays either a percentage of the allowable amount for covered services (e.g. 180% of Medicare) or a percentage of billed charges (after the patient meets their annual out-of-network deductible) for providers that do not contract with BCBS. Out-of-network reimbursements, are often *two to three times higher* than what providers would have expected to have received from a patient with in-network benefits.

36.    Medicare, as federally funded health plan, pays the same for services rendered, and does not recognize any distinction between in-network and out-of-network Medical Groups.

37.    When all parties are acting in compliance with the various in-network agreements, the commercial payors typically pay a lower amount for a covered service, the patient pays a lower deductible and/or co-pay and the healthcare provider(s) receives a lower reimbursement for their services than if the healthcare provided is out-of-network.

38.    The disparity between in-network contract payments and out-of-network payments has the potential to create an incentive to exploit the out-of-network payments, and over the last several years exploitative healthcare providers have attempted to maximize the monetary difference between in-network contract payments and out-of-network payments by utilizing "straw men," "sham entities" or "company models" to obtain out-of-network payment amounts even though they are contractually bound to lower rates through in-network contract agreements held by their primary Employer. These fraudulent and abusive schemes which attempt to exploit this monetary difference have resulted in multiple attempts by both state and federal authorities to curb out-of-network payments to providers, and/or eliminate out-of-network benefits altogether.

## THE SCHEME

39.    TDDC has rapidly grown in both its number of Gastroenterologists and its geographic footprint since 1995.

40.     One of the means by which TDDC attracted new Gastroenterologists is by promising a portion of the revenue from anesthesia services provided to the Gastroenterologists' patients while undergoing endoscopy procedures performed by those same Gastroenterologists.

41.     Over time, the volume and value of anesthesia services monetized by TDDC and its Gastroenterologists warranted the hire of a "Endoscopic and Anesthesia Services Director" named "Eric Dow."

42.     On December 7, 2017, Eric Dow and Dr. Ciarochi had a telephone conversation, which was recorded with the consent of Dr. Ciarochi, during which time Mr. Dow illustrated what he referred to as, "…the anesthesia division up underneath the umbrella of TDDC."

43.     According to his LinkedIn profile, Mr. Dow was given the title, "Endoscopic and Anesthesia Services Director" in 2017, although during the course of the phone call he admitted, "…I've been doing this since 2012…"

44.     Mr. Dow stated that TDDC had, "…a 1099 relationship with CRNAs, ah, [and] we do have some, ah, stand-alone agreements with some MDAs [Medical Doctor Anesthesiologists] …"

45.     Mr. Dow also stated that TDDC had "…a stacking agreement with, um, Star Anesthesia outta San Antonio…"

46.     Mr. Dow stated that, "…we're just right now move, like I said, moving into, ah, ah, Houston and like I said, we have 15 or 16 Gastroenterologists that are joining us."

47.     Mr. Dow then clarified that several Gastroenterologists in Houston were joining TDCC, and moving from one facility to another, "…to have an opportunity to participate in TDDC anesthesia."

48.     Mr. Dow had been introduced to Dr. Ciarochi by the Gastroenterologists who were scheduled to join TDDC on January 1, 2018. Dr. Ciarochi and his Medical Group had been providing anesthesia services to those Gastroenterologists on a fee-for-service basis at their soon-to-be-former facility for several years. Seeing as though those Gastroenterologists now wanted, "…to have an opportunity to participate in TDDC anesthesia," Mr. Dow offered Dr. Ciarochi, Dr. Kenjarski and their Medical Group the opportunity to continue to provide anesthesia services to those Gastroenterologists under the following terms, "…you come in, take high quality care of our patients, um, we'll take care of submitting the claims and do all the billing and collecting, and then you guys send me an invoice, ah, once a month for this many providers at this daily rate, and, and

I will write you a check."

49.     Mr. Dow admitted that the anesthesia services would be billed under TDDC's National Provider Identifier (NPI).

50.     Mr. Dow also admitted that TDDC would be sending bills for anesthesia services to Medicare, Medicaid, UHC, Aetna, Cigna and BCBS.

51.     Mr. Dow also admitted that TDDC outsourced their anesthesia billing and collections to a third-party vendor named, "PeriOp" (Perioperative Services, LLC, 111 Continental Drive, Suite 412, Newark, DE, 19713).

52.     Mr. Dow also admitted that TDDC outsourced the compliance program for their anesthesia division to a guy, "…but he charges too much money." A digital copy of the audio of the phone call between Mr. Dow and Relators is attached hereto as Exhibit "1" and incorporated herein for all purposes. A transcript of such telephone call between Relators and Mr. Dow is attached hereto as Exhibit "2" and is incorporated herein for all purposes.

53.     Seeing as though TDDC did not employ anesthesia providers and outsourced the most important anesthesia practice management functions, TDDC is not a legitimate, commercially reasonable anesthesia practice, but rather a sham company model entity (or in this case perhaps a sham "division" of an otherwise legitimate Gastroenterologist Medical Group) utilized for the sole purpose of providing anesthesia revenue as a kickback to their current Gastroenterologists, and as a means of attracting new Gastroenterologists, in return for referrals of commercial and government program patients to TDDC.

54.     As set forth above, it is clear that TDDC created a scheme to utilize anesthesia revenue as a kickback to lure referrals of individuals (i.e. patients) from Gastroenterologists for which payment was made by commercial payors and government program payors. However, TDDC's company model scheme required numerous anesthesia providers to generate revenue which could then be shared between the anesthesia providers and TDDC, and subsequently kicked back to Gastroenterologists. One of the anesthesia Medical Group's that was complicit in TDDC's scheme was Star Anesthesia, P.A.

55.     According to Star's website, www.staranesthesia.com, Star Anesthesia, P.A.'s providers have been a part of the south Texas healthcare family for over 30 years.

56.     It is unclear to the Relators to what extent Star's relationship with the Gastroenterologists predated TDDC's entry into south Texas.

57.     As set forth above, at some point Star contracted to perform anesthesia services to TDDC through a "stacking agreement."

58.     In order for Star and their anesthesia providers to enter into Independent Contractor Agreement(s) with TDDC, Star would have to waive their exclusive right to bill and collect for their anesthesia providers' services.

59.     There is simply no other reason for a long standing, legitimate, commercially reasonable anesthesia practice like Star to enter into independent contractor "stacking agreements" with TDDC except for the purposes of being complicit in a company model.

60.     In addition to Star waiving their exclusive right to bill and collect for anesthesia services (professional fees) performed by their anesthesia provider employees, Star also had to waive any and all of their contractual obligations with the commercial payors, which bound Star's anesthesia providers to participate in the health care benefit program's network and provide in-network services whenever possible.

61.     Although Star and its anesthesia providers may have been contractually bound to provide services to in-network patients at in-network contractually agreed upon rates, Star and its anesthesia providers circumvented this requirement by providing such anesthesia services under the guise of being an independent contractor to TDDC.  Pursuant to this scheme, the Star employees provided anesthesia services to TDDC for a specified monetary amount, which according to Mr. Dow was a per diem rate with a shift differential which varied from city to city. Star and its anesthesia providers then assigned TDDC the right to bill for the anesthesia services under TDDC's taxpayor identification number.  TDDC then submitted the claim for the anesthesia professional fees and kept whatever amount it received from the commercial payor in excess of the per diem rate it agreed to pay to the Star anesthesia provider. Through this mechanism, Star effectively kicked back the excess funds to the Gastroenterologist through the company model owned by TDDC.

62.     Star may have been under competitive pressure to enter into the "stacking agreements" with TDDC to stem the loss of its business with TDDC altogether.  It is worth noting that Dr. Ciarochi, Dr. Kenjarski, and their Medical Group refused to enter into any agreement with TDDC.

63.     While nothing prevents an anesthesia provider from being credentialed by more than one entity at the same time (e.g. Star and TDDC), Star cannot reasonably argue that the

services being provided to TDDC were "moonlighting" efforts performed by off-duty Star Anesthesiologists who needed a second job, particularly when, according to Eric Dow, the "stacking agreements" were made between Star and TDDC.

64.     All this is possible because the healthcare system is dependent upon the integrity of the healthcare providers and does not have any type of verification system built into the physician billing system up front. That is, ALL commercial and federal payors rely on the provider(s) to submit true and accurate claims. All Star providers were required to submit claims for covered services through the terms of any and all in-network Medical Group Agreement(s). Additionally, ALL commercial and federal payors rely on the provider(s) to collect each patient's out-of-network deductible. Although TDDC was required to collect each patient's out-of-network copay and deductible, due to the fact that out-of-network copays and deductibles are more expensive, Dr. Ciarochi, based upon information and belief, suspects that TDDC may have waived some or all of the patients' out-of-network copays and deductibles so as not to upset the patients, thus providing an inducement for patients to accept out-of-network services from TDDC instead of demanding in-network services from Star.   Since most, if not all, Gastroenterologists participating in TDDC most likely submitted claims for their own Gastroenterology professional fees in-network and collected an in-network co-pay and deductible from the patient for the Gastroenterology professional fees, it is highly unlikely that TDDC would also attempt to collect the full out-of-network copay and deductible for anesthesia professional fees as well.

65.     There are at least two persons/entities that suffer economic harm due to any unnecessary out-of-network billing. First, commercial payors would have paid far more for any anesthesia claims TDDC submitted as out-of-network than they would if those same anesthesia services were billed at the contractual in-network rates set forth in agreements between the commercial payors and Star. Second, if TDDC collected in-network co-pays and deductibles for Gastroenterology professional fees AND out-of-network co-pays and deductibles for anesthesia professional fees, then the patients were paying more than they are contractually bound to pay. On the other hand, if TDDC did not attempt to collect the applicable out-of-network co-pays and deductibles for anesthesia professional fees, it was providing an inducement and engaging in an additional form of fraudulent billing.

66.     Seeing as though the Star anesthesia providers were instructed by TDDC as to what cases would be done, in what sequence they would be done, where they would be done, and at

what location they would be done on a daily basis *indefinitely*, the Anesthesiologists and CRNAs who contracted with TDDC failed IRS tests for Employee vs. Contractor designation, and were paid in the form of Miscellaneous "1099" income for the sole purpose of TDDC avoiding their employer portion of payroll taxes and the cost of extending benefits to anesthesia providers.

67.     Star may also have received additional federal health care program dollars from TDDC facilities paid in the form of stipends and/or medical directorships, as an indirect result of kickbacks to the Gastroenterologists via the company model.

68.     Star may also have received additional federal health care program dollars from referrals of individuals from TDDC Gastroenterologists to Star at facilities which were "carved out" of the company model scheme, where Star was permitted to bill for their anesthesia providers professional fees through the Star Anesthesia, P.A. entity on a fee-for-service basis, in return for participating in the company model scheme elsewhere.

## COUNT I:  Violations of the False Claims Act

69.     Each of the foregoing allegations is realleged and incorporated hereby.

70.     As described in this Qui Tam Complaint, Defendants, by and through its officers, agents, and employees have since 2012: (i) knowingly presented, or caused to be presented, to the United States Government, to state Medicaid payors, and/or commercial payors, a false or fraudulent claim for payment or approval; (ii) knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States Government, state Medicaid payors, and/or commercial payors; and (iii) knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government, state Medicaid payors, and/or commercial payors.

71.     Defendants authorized and ratified all the violations of the False Claims Act committed by its various officers, agents, and employees.

72.     The United States Government and the public, together with state Medicaid systems and/or commercial payors, have been damaged because of the Defendants' violations of the False Claims Act.

73.     Dr. Ciarochi and Dr. Kenjarski request a jury trial on all issues so triable.

## COUNT II:  Violations of the Anti-Kickback Statute

**74.**     Each of the foregoing allegations is realleged and incorporated h e r e b y .

**75.**     As described in this Qui Tam Complaint, Defendants, by and through its officers, agents, and employees beginning in 2012: (i) knowingly and willfully solicited and received a bribe, kickback and/or rebate in cash or kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of an item or service for which payment was made in whole or in part under a Federal health care program, or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program; (ii) ) knowingly and willfully offered and/or paid kickbacks, bribes, and/or rebates in cash or kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of an item or service for which payment was made in whole or in part under a Federal health care program or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program; Each of these acts or omissions constitute forbidden "pay to play" schemes in violation of the Anti-Kickback Statute.

**76.**     Defendants authorized and ratified all the violations of the Anti-Kickback Statute committed by its various officers, agents, and employees.

**77.**     The United States Government and the public, together with state Medicaid systems and/or commercial payors, Dr. Ciarochi and Dr. Kenjarski have been damaged because of the Defendants' violations of the Anti-Kickback Statute.

**78.**     Dr. Ciarochi and Dr. Kenjarski request a jury trial on all issues so triable.

**79.**     WHEREFORE, Relators Joel Ciarochi, M.D., M.B.A, and Thomas Kenjarski, M.D. on behalf of themselves and the United States Government, prays:

    (i)     that this Court enter a judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendant's violations of the False Claims  Act;

    (ii)    that this Court enter a judgment against Defendants for a civil penalty of

$10,000 for each of Defendant's violations of the False Claims Act;

(iii)    that Relators Joel Ciarochi, M.D., M.B.A, and Thomas Kenjarski, M.D. recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

(iv)    that Relators, Joel Ciarochi, M.D., M.B.A. and Thomas Kenjarski, M.D. be awarded all reasonable attorneys' fees in bringing this action;

(v)    that in the event the United States Government proceeds with this action, Relators Joel Ciarochi, M.D., M.B.A. and Thomas Kenjarski, M.D. be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

(vi)    that in the event the United States Government does not proceed with this action, Relators Joel Ciarochi, M.D., M.B.A. and Thomas Kenjarski, M.D. be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

(vii)    that Relators Joel Ciarochi, M.D., M.B.A. and Thomas Kenjarski, M.D. be awarded prejudgment interest;

(viii)    that a trial by jury be held on all issues so triable; and

(ix)    that Relators Joel Ciarochi, M.D., M.B.A. and Thomas Kenjarski, M.D. and the United States of America receive all relief to which either or both may be entitled at law or in equity.

Respectfully Submitted,

**PAYNE ROBINSON, L.L.P.**

/s/ Christopher A. Payne
Christopher A. Payne
Texas State Bar No. 15651500
Chris.Payne@PayneRobinson.com
Tim Robinson
Texas State Bar No. 17115450
Tim.Robinson@PayneRobinson.com

Christina Alstrin
Texas State Bar No. 24068019
Christina.Alstrin@PayneRobinson.com
Aaron Robinson
Texas State Bar No. 24085705
Aaron.Robinson@PayneRobinson.com
9101 LBJ Freeway,
Suite 760
Dallas TX 75243
Telephone: (214) 945-1022
Facsimile: (214) 945-1023

**Attorneys for Relators**
**Joel Ciarochi, M.D., M.B.A.**
**and Thomas Kenjarski, M.D.**



**[Please enter your conference number followed by the # key.  Please enter the conference pin number.  After the tone, say your name and then press the # key.]**

Joel Ciarochi:  Tom, Joel and Mike.

**[Thank you.  Press 1 to accept this recording.  Your message has been saved.]**

Joel Ciarochi:  Hello?

Eric Dow:     **** Eric Dow here.

Joel Ciarochi:  Hey, Eric, ah, you have Joel Ciarochi, Tom Kenjarski and Mike Watts.

Eric Dow:     Hello.

Tom Kenjarski:        Good morning.

Michael Weiss:        Hey buddy.

Joel Ciarochi:  You doin' all right today?

Eric Dow:     Good, how about you?  Tryin' to stay warm.

Joel Ciarochi:  Yes, sir.  Are you, um, in, ah, North Texas or Houston?

Eric Dow:     I'm actually in North Texas today.

Joel Ciarochi:  Oh good, congratulations, welcome home.

Eric Dow:     Got back from Houston yesterday.

Joel Ciarochi:  Good.  Hopefully it was a good trip.

Eric Dow:     It's actually cold and rainy down there.

Joel Ciarochi:  You know, it does happen every once in a while.

Eric Dow:     Yeah, I actually had to wear a coat.

Joel Ciarochi:  Really?  Wow.  So I wanted to get Tom and Mike on the call, um, so, um, everyone, the, by the way, we're the three managers of Noble, so you, you've got, you've got everyone here, so we can No. 1 make sure that we all understand what the relationship's gonna be and No. 2, try to figure out, you know, a rate schedule that works for everybody.

Eric Dow:     Okay.  Did you fill them in, fill them in on who Ryan, and who TDCC is and kind of the back story?



**EXHIBIT**

**2**

Joel Ciarochi: No, a, a little bit, but I'd love to hear it from you for their sake.

Tom Kenjarski:        Please.

Eric Dow:        Sure.  Sure.  Well, Texas Digestive Disease Consultants is, is based here in Dallas, ah, but we have a footprint that's basically all in the Metroplex.  We're up to about a 130 doctors now, and it goes south, basically up and down the 35 corridor, um, San Marcus, New Brownsville, San Antonio, Cedar Park, ah, then we have a group of, ah, 15 or 16 doctors joining us, ah, in Houston January 1.  Ah, kinda my role is, is to oversee, ah, the anesthesia division up underneath the umbrella of TDDC, um, and we have, ah, various models through the state and most, the majority of our relationship, um, is 1099 relationship with CRNA's, ah, we do have some, ah, standalone agreements with some MDAs in Plano and then one in Cedar Park, ah, and then ah, we actually have a stacking agreement with, um, Star Anesthesia outta San Antonio, so each, each geographical location is a little bit different, um, and we're just right now move, like I said, movin' into, ah, ah, Houston and like I said, we have 15 or 16 gastroenterologists that are joining us, um, you know, I have approximately one, two, three, four, five or six of 'em that want to participate in TDDC anesthesia.  Ah, the other ones at this time do not for various, ah, other arrangements that they have, um, honestly I believe over time they will transition over it, over to us, ah, but currently we're just dealin' with, ah, the five or six, um, you know, that wanna participate as soon as we can.  Ah, we have, ah, put out a tentative schedule, ah, currently these are only in, ah, the two Sugarland locations, the Memorial Harmon Sugarland ASC and the Memorial Harmon First Colony Hospital.  Ah, currently we have a need, ah, to run only one room 5 days a week, you know, so we would be looking for, ah, some type of coverage, ah, A, either to help us cover random days or if you guys want it all the time that's, you know, then that makes my life easier, um, you know, but it's lookin' at maybe probably 4 days a week at the First Colony Hospital and maybe 1 day a week at the ASC, and then honestly as time goes on, um, you know, I think it'll, it'll grow into other locations.  Um, and then that's kinda it on the immediate need, and then, ah, what Joel and I have talked about, you know, is, is really it would be a, you know, to have you guys as a partner, you know, wherever we go, you know, to come along and, A, either you have an existing footprint, ah, you know, kinda extend the agreement on to different geographical locations and, and, or help us, you know, as a backup staffing role where we need the help, you know, and, and I think that's, you know, kinda my 2-second story, or 2-minute story.

Tom Kenjarski:        And how did you get into anesthesia world?

Eric Dow:     I'm sorry?

Tom Kenjarski:        How did you get into the anesthesia world?

Eric Dow:     Ah, basically told to, ah, I'm not an anesthesiologist, I am a registered nurse, um, you know, I've been in, ah, this ACS field for probably 22 years, um, most of that role is in the administrator type of role, um, I have a long history with USPI and I assume you guys know who that is, and –

Tom Kenjarski:        Mm hmm.

Eric Dow:        – and they have a, um, but from about 2012, ah, through about 2016, you know, USPI decided to, you know, get into the anesthesia business and then, as most of you know, Tenant bought them out and said you need to get out of the anesthesia business and, and I, I ran our division up in, in Tarrant County that, you know, encompassed three locations and, you know, we did 15, 1,800 cases a month in three different GI centers up here, ah, but then when USPI decided to get out, that's when we internalized it without TDDC, and then started rolling out other divisions of TDDC doctors up underneath our umbrella, if that makes sense.

Tom Kenjarski:        Mm hmm.  Excellent.

Joel Ciarochi: And then, um, Eric, would you tell the guys kind of how your structure your relationship with, ah, with the physicians?

Eric Dow:        Well, in a, you know, in a non-staffing agreement we just 1099 contract with 'em, um, but in staffing agreements like **** Star Anesthesia in San Antonio, we've established an agreement, ah, to where, you know, depending on the dynamics of, you know, if I tell you I need one provider at this location 3 days a week or if I say, you know, depending on those scheduling dynamics, um, we just stay in constant communication about that, um, you, you come in, take high quality care of our patients, um, we'll take care of some submitting the claims and do all the billing and collecting, and then you guys send me an invoice, ah, once a month for this many providers at this daily rate, and, and I will write you a check.

Joel Ciarochi: Okay, and when, when you do the billing, um, you guys do all the billing through TDDC?

Eric Dow:        Correct.

Joel Ciarochi: Okay, and then you basically would take our physicians MPI, bill that under our physicians MPI with your MPI, ah, TDCC?

Eric Dow:        Correct.

Joel Ciarochi: And TDDC is a professional group, right, this isn't fac, um, submitting the billing through a facility?

Eric Dow:        Correct.

Joel Ciarochi: Okay, and then you guys are gonna bill everybody, you're gonna bill Medicare, Medicaid, United, Aetna, CIGNA, Blue, all, all the above?

Eric Dow:        Yes, sir.

Joel Ciarochi:  Okay, and then, do you guys have, um, insurance contracts that we would need to credential under, so for example, would we need to credential, ah, our providers with Medicare through your entity?

Eric Dow:      Yes.

Joel Ciarochi:  Okay.

Eric Dow:      Yeah, so that's why, you know, I'm a little bit under, you know, the gun, you know, they get those guys wanna to join, they wanted us to start January 1, but obviously that's out the window, ah, I think we're lookin' our earliest a February date.  If we can come to an agreement we would need to start **** the credentialing process, ah, obviously with our billing company underneath our contracts, um, and then just assuming you may or may not need credentialing at the facility.

Joel Ciarochi:  Okay, and then, do you guys, ah, I don't care, but do you guys, ah, do this in or out of network primarily?

Eric Dow:      Ah, mostly in network.

Joel Ciarochi:  Okay.  Um, and then, so, okay, and then do you guys have a stacking agreement or some kind of contract that you can send to us?

Eric Dow:      Yeah, absolutely, we can, I can just take the Star Anesthesia agreement and can kinda go from there.

Joel Ciarochi:  Perfect, perfect, no, that would be great.

Joel Ciarochi:  Um, so at least, and my understand when I talked to you and I just wanted to make sure we all understand the same thing, basically you guys, ah, you guys would give us dates and times that you need coverage.  We would send a physician to provide coverage, you would pay us a, a, a day rate, so, you know, for the whole day, or do you do it hourly or is it some kinda combination?

Eric Dow:      Well, historically we've done a, a daily rate that typically computes out to 8 hours, and then pro rate, um, after 8 hours based on whatever that daily rate is divided by 8.

Joel Ciarochi:  Okay, so we have a day rate for 8 hours, and let's say you went 10 hours, effectively you pay us 2 hours of overtime, or whatever that formula is.

Eric Dow:      Correct, and then if, if you show up and only work 6 hours you still get that full 8-hour day rate.

Joel Ciarochi:  Okay, so you're basically gonna guarantee a minimum, so, ah, because –

Eric Dow:      Correct.

Joel Ciarochi: – our, our physicians are really, really good, they hustle, so if they gave your cases outta there in 5 hours they're not gonna be penalized.

Eric Dow:     Exactly. Ah, that's not fair, I wouldn't ask that of anybody.

Joel Ciarochi: No, I, I understand that, I'm, I'm asking these questions 'cause we found ourselves in certain situations where, you know, we work really hard and then we get penalized for our hard work, so, um, you know, –

Eric Dow:     And, and that's not, you know, as, as we go down this road you're gonna understand that, you know, we're lookin' for a partner, we're not tryin' to hurt anybody or screw anybody, and we want a partner to take high quality care of our patients and you guys get compensated fairly for, for the work that you've done, and if you get us in and outta there quicker than 8 hours that's, you know, that's more production for our GI doctors. We, we're human, we realize that. No, but I understand your, your fear, and that's a great question.

Joel Ciarochi: Yeah, then, then the other question is, just from a compliance standpoint, um, do you guys have an anesthesiologist, um, that helps you with compliance, um, or if you don't, would you want us to help you with that, um, –

Eric Dow:     That's somethin' that we have historically done in the past, ah, we've contracted with a, a guy out at Collard that comes in and does annual competencies –

Joel Ciarochi: Okay.

Eric Dow:     – um, you know, and, and does, you know, oversees our PQRS, you know, submissions. That's somethin' that we are, you know, he's a good guy, but he charges too much money and that's somethin' that, you know, I –

Joel Ciarochi: Mm hmm.

Eric Dow:     – think is another opportunity for us to partner together, you know, I can use some help on that, on that front, not only in Houston but, you know, as the company at large.

Joel Ciarochi: Okay, and then, do you guys do your billing in-house, or do you outsource it to somebody?

Eric Dow:     We outsource it.

Joel Ciarochi: Okay. Ah, do you have any interest in, um, ah, looking to do something different with your billing?

Eric Dow:     We will always listen, um, we are, we use Periop, ah, we're very happy with 'em currently.

Joel Ciarochi: Okay, okay, that, that's fine, so that, they're a big company, I gotcha. No, 'cause we, one thing that we have historically done, um, is we do all of our billing in-house to make sure that it's done correctly, because what we found is when you send it to somebody else that doesn't have your name on the door, that there can be, um, a lack of, ah, interest in collecting the money, and there can be a lack of compliance, and so that's, ah –

Eric Dow:      Yeah, and they've, we've been very happy with them, you know, I've been involved, I mean, believe me, I've, they are our, you know, I been doin' this since 2012 and they are our third billing company, but they've –

Joel Ciarochi: Uh huh.

Eric Dow:      – you know, they've been solid for the last 4 or 5 years.

Joel Ciarochi: Okay, perfect, no, that's, that's great. Um, okay, um, other stuff. So really, you know, what do you guys, ah, typically pay, um, you know, we can kind of figure out, you know, kind of where, where you guys are, um, our providers all get paid, um, differentials for working, for example, if you have Saturday cases, um, we can't pay somebody what we pay them on a Monday for a Saturday, that, that's not gonna fly, um –

Eric Dow:      No, I understand.

Joel Ciarochi: – um, so, you know, what, where are you guys, what's kind of your range, ah, in terms of compensation?

Eric Dow:      Ah, I mean, it, it's really based on market, because you know, I'm an open book. We paid Cedar Park $1,200.00 a day, we pay, ah, Plano $2,000.00 a day, we play, ah, you know, San Marcus, I'm sorry, not San Marcus, ah, San Antonio, you know, it varies from 15 to $1,700.00 a day, so and it, it's all, honestly **** –

Joel Ciarochi: Gotcha.

Eric Dow:      – um, you know, it's really just comin', comin' together and agreed up, you know, rate, let's, I mean, let's not talk about Saturday right now, that's –

Joel Ciarochi: Sure.

Eric Dow:      – I do agree that's extra, that's separate, um, but Monday through Friday what do you guys, what were you guys thinkin'?

Joel Ciarochi: Ah, I mean I think you're in the range, I, I think, you know, $2,000.00 would make everybody happy, ah, obviously that's –

Eric Dow:      Two thous, I can't do 2,000.00 down there, those doctors, you know, those doctors who are, you know, I've, I've got a couple of PRNs ready to go, you know, in the 13 to 1,400

range, so, you know, 2,000 is an anomaly that I'm overpaying in Plano that I wish I could get rid of the guy.

Joel Ciarochi: Okay, fair.

Eric Dow:      But he only works 3 days a week, so –

Joel Ciarochi: Yeah, fair enough. Yeah, our, um, our provider cost, um, exceeds $1,300.00 in a day, I mean it just does. All of our providers are full time, um, you know, they, ah, they're not, they're not PRN with us in any kind of method, so, you know, they get paid a total compensation package with vacation every year.

Eric Dow:      Right.

Joel Ciarochi: So, um, you know, I, I can, you know, I probably am gonna have to really crunch into some numbers to kinda see where we are, but you know, $2,000.00 would work. I don't know if the 1,500 to $1,700.00 range would work or not mathematically, but I, I can certainly, you know, get back with you on that.

Eric Dow:      Yeah, just let me know, um, and then I'm not the decision maker –

Joel Ciarochi: Understandable.

Eric Dow:      – ah, on this it is the local doctors, ah, in that area, you know, as we, you know, as I told you the, you know, there's a big difference between 1,200 and 2,000 you know, that really is dependent on the local GI guys, you know, those, they make those compensation decisions.

Joel Ciarochi: Oh, I gotcha –

Eric Dow:      Um –

Joel Ciarochi: – I gotcha.

Eric Dow:      – and I'm just, I'm kinda the middle man.

Joel Ciarochi: No, I –

Eric Dow:      Whatever number you take –

Joel Ciarochi: Yeah, no –

Eric Dow:      – I take back to –

Joel Ciarochi: I, I understand.

Eric Dow:      – ah, guys and see what they'll say.

Joel Ciarochi: So the only two guys that, that I'm aware of that we currently cover that are movin' to you guys are, ah, Vachani and Hetmathen, um –

Eric Dow:      Correct, and I've got, Vac, Vachani would be the biggest fish, um –

Joel Ciarochi: Yes.

Eric Dow:      – you know, 2 days a week, quite a few cases, ah, Hetmathen's also coming, um, Fiman's comin' on, on a limited basis, ah, and then Davis and Travameno as well on a limited basis.

Joel Ciarochi: Oh, okay, do they, I, I'm not aware of them working at Sugarland, ah, ASC.  Are they gonna move over there?

Eric Dow:      Yes.

Joel Ciarochi: Okay.  I gotcha, so they're gonna move from **** there.  They're basically gonna bring their cases to Sugarland ASC versus wherever they go now.

Eric Dow:      Right, to, to have an opportunity to participate in the TDDC anesthesia.

Joel Ciarochi: Perfect.  No, I, I understand completely.  Okay, cool, um, so, um, Tom, Mike, you guys have other questions?

Tom Kenjarski:      No, seems pretty clear.

Michael Weiss:      No.

Joel Ciarochi: Okay, so, um, I'll get back to you with numbers and, ah, you can send over like your template agreement, um, we'll get to work on that as well, just to make sure there's no, ah –

Eric Dow:      Okay.

Joel Ciarochi: – no issues with, with the documentation, so –

Joel Ciarochi: And, and once again, when were you thinking about getting started?

Eric Dow:      Well, I mean, I think at this point I think we're lookin' at February 1 at the earliest, um, and that's dependent on how fast we come to an agreement and, and get the, ah, credentialing piece finished.

Joel Ciarochi: ****.

Eric Dow:      I think **** maybe into mid-February, first of March.

Joel Ciarochi: Okay, okay. You know, ah, do you guys do the credentialing or does Periop do that?

Eric Dow:   Ah, combination effort between both of us.

Joel Ciarochi: Okay, and, and how long does it typically take you guys to get credential, I know Medicare's the biggest pain. How long does it take to get folks credentialed with Medicare?

Eric Dow:   Ah, I mean, sometimes it is 45 days, ah, commercial payors usually aren't that painful.

Joel Ciarochi: Yes, sir.

Eric Dow:   Um, we historically take it pretty slow so we don't slow, we would rather wait an extra 30 days to not slow the claims down.

Joel Ciarochi: Gotcha.

Eric Dow:   Um, but what is the official name that I need to load into this contract?

Joel Ciarochi: Um, it would be Noble Anesthesia Partners, PLLC.

Eric Dow:   Okay. You'll have that, ah, by the end of the day.

Joel Ciarochi: Oh, thank you.

Eric Dow:   Address and record just on your web site?

Joel Ciarochi: Um, yes, sir, um, 9101 LBJ Freeway.

Eric Dow:   You're just down the road.

Joel Ciarochi: Yes, sir, no, no, I, I mean, that's what I'm saying, you're close, we need to meet with you face-to-face at some point, it's just, ah, with the Super Bowl of anesthesia this month, and you know, your travel schedule and my travel schedule, it's just really hard to get everybody together.

Eric Dow:   Yeah, true.

Next Speaker: Um, and that's Dallas, Texas 75243.

Eric Dow:   Okay. I've have that to ya by the end of the day, ah, when you do think you'll have some numbers back to me?

Joel Ciarochi: Um, end of the week, ah, I'm gonna be in Houston, um, through Sunday, so possibly Monday, ah, but, but quick, it, it shouldn't take that long.

Eric Dow:          Okay. All right, any questions for me?

Joel Ciarochi:  Gentlemen?

Tom Kenjarski:       No more at this time.

Michael Weiss:        Thank you.

Eric Dow:       Thank you.

Joel Ciarochi: Ah, we really appreciate it and, ah, we will definitely find a time to try to at least meet with you, ah, face-to-face, ah, you know, 'cause we're, we're so close there, there's no reason why we shouldn't.

Eric Dow:          Yeah, absolutely.

Joel Ciarochi: All right.

Eric Dow:          All right, gentleman, nice meeting you and, ah –

Michael Weiss:         Thank you, Eric, we really appreciate it.

Eric Dow:       **** and stay warm.

Tom Kenjarski:        Thank you, you as well.

Eric Dow:          Bye.

**SpeakWrite**
www.speakwrite.com
Job Number: 18033-001
Custom Filename: Tom Kenjarski
Date: 02/02/2018
Billed Words: 3484